## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

### CASE No: 15-CR-00043-GFVT-HAI

**UNITED STATES OF AMERICA**

*Plaintiff,*

**v.**

**RALPH MINIET,**

*Defendant.*

_____/

### <u>SENTENCING MEMORANDUM AS TO</u>
### <u>DEFENDANT, RALPH MINIET</u>

      **COMES NOW** the Defendant, RALPH MINIET, by and through undersigned counsel, and the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and the United States Constitution, hereby files his sentencing memorandum. In support of this memorandum, Mr. Miniet sets forth the following statement of facts and legal arguments:

      1.     In *United States v. Booker*, 125 S. Ct. 738 (2004), the Supreme Court held that the United States Sentencing Guidelines, as written, were unconstitutional. The Court created its own remedy by excising those portions of the Federal sentencing statutes which made the guidelines mandatory to satisfy the Sixth Amendment to the United States Constitution. The Supreme Court held that "the Sixth Amendment right to trial by jury is violated where, under a mandatory guideline system, the sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant, nor found by the jury." *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir.2005) (*citing United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 764–65, 160 L.Ed.2d 621 (2005)).

2.      The Supreme Court's remedial holding in *Booker* mandates District Courts to calculate and apply the guidelines as they now exist, but a *Booker* error occurs when the District Court misapplies the guidelines by considering them binding, as opposed to advisory. *United States v. McCraven*, 401 F.3d 693, 700 (6th Cir. 2005)

3.      The Supreme Court again recognized in 2009 that lower courts were (still) placing too much weight and emphasis on the advisory sentencing guidelines. In *Spears v. United States*, 555 U.S. 261 (2009), the Court emphasized that lower courts are in no way bound to apply the sentencing guidelines and can impose a sentence lower than the guidelines even if that sentence is based solely on the district court judge's disagreement with them [the guidelines].  The Court wrote:

> "Even when a particular defendant…presents no special mitigating circumstances…no outstanding service to the country or [the] community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation, a sentencing court may nonetheless vary downward from the advisory guideline range…[The] only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines."

4.      The following year, in <u>*Nelson v. United States*</u>, 555 U.S. 350 (2009), the Court reversed the Fourth Circuit for affirming a guidelines sentence and noted the district court judge's assertion at sentencing that "[the] guidelines are considered presumptively reasonable…unless there's a good reason in the [application of] 3553(a) factors…the guideline sentence is the reasonable sentence."  The Supreme Court explained that: "[T]he Guidelines are not only ***not mandatory on sentencing courts; they are also not to be presumed reasonable.*** (Emphasis added). We think it plain from the comments of the sentencing judge that he did

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

apply a presumption of reasonableness to Nelson's Guideline range.   Under our recent precedents, that constitutes error." *Id*.

5.     The key to any departure within the present advisory guideline scheme is whether or not such a departure is unreasonable. Sentences imposed post-Booker are reviewed for procedural and substantive reasonableness. *U.S. v. Kathman*, 490 F.3d 520, 523–24 (6th Cir. 2007);  *United States v. Webb*, 403 F.3d 373, 383 (6th Cir.2005), cert. denied, 546 U.S. 1126, 126 S.Ct. 1110, 163 L.Ed.2d 919 (2006). Once the appropriate advisory guideline range is calculated, it must be considered along with the other pertinent § 3553(a) sentencing factors. *United States v. McBride*, 434 F.3d 470, 476 (6th Cir.2006).

6.     In reviewing a sentence for substantive reasonableness, the starting point is the advisory guideline range because it is one of the § 3553(a) factors and because the guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors. *United States v. Davis*, 458 F.3d 491, 496 (6th Cir.2006). "While a sentence within the guideline range is presumptively reasonable, a sentence outside the guidelines is not presumptively unreasonable. *U.S. v. Kathman*, 490 F.3d 520, 524–25 (6th Cir. 2007)(*citing, United States v. Foreman*, 436 F.3d 638, 644 (6th Cir.2006). In reviewing a non-guidelines departure, often referred to as a variance, we apply a proportionality review. *Davis*, *supra*, 458 F.3d at 496. That is, the farther the sentence departs (upward or downward) from the advisory guideline range, the more compelling the § 3553(a) justification must be.

Applicability of Variance under 3553(a)

7.     The Court must follow the three-step process set forth by *Gall v. United States*. First, the court properly determines the guideline range.   Second, the court determines

whether to apply any of the guidelines' departure policy.  Third, the court considers all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance is warranted. The result of the Court's three-step analysis is, after making an individualized assessment, to fashion a reasonable sentence that is "sufficient, but not greater than necessary," to fulfill the federal sentencing requirements of 18 U.S.C. § 3553(a).

8.   District courts are only required to give some weight to the advisory guidelines as they are also to be "guided by the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir.2005) (citing *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 764–65, 160 L.Ed.2d 621 (2005)). Section 3553(a) mandates as follows:

> The court, in determining the particular sentence to be imposed, shall consider—(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed ... (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [under the sentencing guidelines] ... (5) any pertinent policy statement ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a).

Once informed by these factors, the Court's sentence must be:

> Sufficient but not greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

9.      "Guided by the factors and in light of these purposes, the Court is tasked with crafting a sentence that is reasonable and articulat[es] specific findings in support of that imposed sentence." *U.S. v. Jenkins*, 122 F. Supp. 3d 639, 644–45 (E.D. Ky. 2013)(*citing, Jackson*, 408 F.3d at 304 and *Booker*, 125 S.Ct. at 765); See also *United States v. Bolds,* 511 F.3d 568, 580 (6th Cir.2007) ("the district judge must make an individualized assessment based on the facts presented and upon a thorough consideration of all of the § 3553(a) factors.") (internal quotations omitted).

10.      As such, Mr. Miniet, without regurgitating information already contained in the Pre-Sentence Investigation Report proposes that the sentencing goals can be accomplished by looking to the guidelines, Objections/Responses to the PSIR, and §3553(a) factors.  Mr. Miniet requests a reasonable sentence that is sufficient but not greater than necessary. Mr. Miniet's offense conduct is outlined in the PSIR (from the government's perspective) and in the Defendant's Responses/Objections to the PSI (from the Defendant's perspective). Mr. Miniet understands and agrees that federal sentencing law requires the Court to impose a sentence that is reasonable and that the Court must consider the Sentencing Guidelines in determining that reasonable sentence.   A reasonable sentence that is "sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a), is the lowest possible sentence that accounts for **all** the relevant statutory factors delineated above. Those statutory factors are delineated above. *See also*, 18 U.S.C. §3553(a)(2019); in furtherance thereof, Mr. Miniet asks the court to consider the following Title 18, USC, § 3553(a) factors:

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

Nature and Circumstances of the Offense

This case does not present as a typical "pill mill" where a treating physician was alert, intelligent, and willfully joined a conspiracy knowing of its illegal purpose. Here, as we believe the testimony bore out during trial, Dr. Miniet was at times negligent in his screening of patients and in conducting physical exams. There is no doubt that the patients who saw Mr. Miniet were diverting their prescription medication and there is no doubt that Mr. Miniet could have done a much better job. The Court sat through the first trial in this matter and can rely on its memory and recollection of the evidence presented.

**Using Every Prescription written by Dr. Miniet Overstates the Drug Quantity**

The base offense level as calculated in the PSIR overstates the criminal responsibility of Mr. Miniet. The minimum allowable offense level under USSG §2D1.1 for a drug quantity of oxycodone is a level 12 and is a more appropriate base offense level to use in this matter. As a matter of policy, the court should disagree with the "converted drug weight" tables as they are **not based on any scientific and/or empirical evidence**. A district court may indeed disagree with a Guideline for policy reasons and may reject the Guidelines range based on that disagreement. *U.S. v. Brooks*, 628 F.3d 791, 799–800 (6th Cir. 2011)(*citing*, *United States v. Herrera–Zuniga*, 571 F.3d 568, 585–86 (6th Cir.2009) (concluding that the Supreme Court's decision in *Kimbrough v. United States*, 552 U.S. 85, 109–110, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), authorizes district courts to reject a Guidelines range because they disagree with the policy rationale behind the applicable Guideline); *United States v. Janosko*, 355 Fed.Appx. 892, 895 (6th Cir.2009) (recognizing that "district courts may choose to reject guideline sentences for child-pornography offenses simply due to policy disagreements with those guidelines")).

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

As the result of guideline amendments effective November 1, 2003, one gram of "oxycodone (actual)" is the equivalent for guideline sentencing purposes of 6.7 kilograms of marijuana. This "equivalence" is unreasonable and penalizes offenses involving oxycodone differently from and more harshly than offenses involving the other opiates... The Drug Equivalency Table was amended effective November 1, 1991,42 to reference conversion to a single substance, marijuana, rather than to the previous four substances... The current §2D1.1(c) Drug Equivalency Table, attaching 6.7 kilograms of marijuana to one gram of oxycodone (actual), is the product of amendments to guidelines made effective on November 1, 2003. The rationale for the amendments modifying the oxycodone equivalence is fully disclosed in the "Reason for Amendment" section of the Sentencing Commission's "Official Text" of those amendments. [1] ...    The amendment was prompted by a disproportion in the guideline sentencing ranges resulting from the differing pill weights of two oxycodone medications — Percocets and OxyContins.   Percocets were compounds of oxycodone with acetaminophen.  A Percocet pill containing 10 mg of oxycodone weighed 550 mg.  Less than 1% of the weight was attributable to the 10 mg. oxycodone active ingredient. OxyContin pills, whether containing 10 mg, 20 mg, or 40 mg of oxycodone, each weighed 135 mg.  In the 10 mg OxyContin, 7.4% of the weight was attributable to the oxycodone active ingredient. Prior to the amendment, oxycodone quantities were measured by the total weight of the carrier medium that included the oxycodone — "Consequently prior to this amendment, trafficking involving 364 Percocet pills or 1,481 OxyContin pills resulted in the same five year sentence of imprisonment." Though the Sentencing Commission resolved the disproportion between different formulations of oxycodone, specifically Percocets and OxyContins, in the process it created a unique "equivalency" for oxycodone offenses that was neither based on "actual" oxycodone content nor rationally related to any pharmacological or other equivalence among oxycodone and the other opiates.

See, *Quantity Dependant Sentencing Ranges*, The Drug Equivalency Table and Ocycodone (Acutal), Michael J. Liston, Esq. (2014).[2]  As such, undersigned would argue that, under the

---

[1] http://www.ussc.gov/sites/default/files/pdf/amendment-process/officialtext/20030501_Amendments.pdf

[2] https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/quantity-dependent-sentencing-ranges-the-drug-equivalency-table-and-oxycodone-actual.pdf

facts of this particular case, and with this particular Defendant, the base offense level calculated in the PSIR is not based on a reasonable competent evidence as to amount of pills and the conversion severely overstates his criminal responsibility.

History and Characteristics of the Defendant

Ralph Miniet is a "true" first time offender with no arrests or convictions of any kind. Under Chapter Four of the Guidelines Manual, "first offenders," offenders with no criminal history whatsoever, are addressed only by reference to Criminal History Category I; however, Category I includes not only first offenders with no criminal history but also offenders with varying criminal histories. (Category I includes offenders with one criminal history point; offenders who have prior convictions that are not counted because they were too old; and, offenders who have prior convictions that are not used in computing the criminal history category for reasons other than their "staleness."). Here, Miniet has spent a lifetime of trying to help his patients from infants to adults, through surgery and through family medicine. He has given his life to the practice of medicine; he should have remained retired prior to getting involved with the clinic that is the subject of his charges.

Finally, Mr. Miniet's character is touched upon by the letters filed in support of his sentencing.  By all accounts, Mr. Miniet has lived an exemplary life making his way to the United States as a child and becoming a respected physician.

The Need for the Sentence Imposed:

Mr. Miniet has zero criminal history points. A sentence within the advisory guideline range would not provide just punishment in light of the offense conduct as described in the

PSIR and other sentencing documents; further, based on Mr. Miniet's characteristics, a guideline sentence is not necessary to deter criminal conduct: Mr. Miniet has shown that he is otherwise a productive member of society.  Further, there is minimal concern that a non-incarcerative sentence would fail to protect the public from future crimes of the Defendant. His offense conduct was more of an anomaly in his life; regardless, a lesser sentence will generally lower the rate of recidivism of the offender. Recently, in December 2017, the United States Sentencing Commission released their study that indicates a man of Mr. Miniet's age, education level, and criminal history category, and type of offense produces one of the lowest recidivism rates of almost all federal offenders. Other studies released by the Commission also support a greatly reduced risk of recidivism for the 25,000 offenders that have been followed since their release dates in 2005. A list of publications reviewed by undersigned can be found at:

- https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview
- https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf
- https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

Further, pursuant to U.S.S.G. § 5H1.1, "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish this case from the typical cases covered by the guidelines." In addition, U.S.S.G. § 5H1.3 provides that, "[m]ental and emotional conditions may be relevant in determining

whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." At the time of this offense, Mr. Miniet was an older man in his 70's.  Furthermore, Mr. Miniet has acknowledged that he should not have continued to practice medicine after his initial retirement and his since voluntarily relinquished his medical license to the Florida Department of Health with the promise to never seek reinstatement.  Mr. Miniet is not only a very old man, but has early signs of some organic disorder as pointed out in Dr. Jordan's evaluation in 2017 as mentioned in ¶ 58 of the PSIR: "Miniet does not have a significant cognitive impairment, though noted that the defendant's memory deficit was apparent. Dr. Jordan opined that Miniet demonstrates a memory deficit and emotional liability that could be related to developing organic brain disorder. Dr. Jordan cited that Miniet's history of cardiovascular and cerebrovascular disease would contribute to the theoretical organic brain disorder."  Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. U.S.S.G. § 5H1.1.  Miniet is both elderly and infirmed; additionally, he faces significant risks associated with the global pandemic as further outlined below.

The need to protect the public from future crimes of the defendant:

All factors regarding recidivism rates pursuant to the 2016 United States Sentencing Commission Study indicate that Mr. Miniet is one of the least likely type of offenders to be rearrested or reconvicted. Being a true first-time offender, a male, the nature of the charges, Mr. Miniet's age, and his level of education (post graduate doctoral degree), he is one of the most unlikely reoffenders. Recidivism and Offender Characteristics Studies have repeatedly

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings. Age at release also is associated with different rates of recidivism.    The older the age group, the lower the rearrest rate.  The same pattern holds for reconviction and reincarceration.

The Kind of Sentences Available/Sentencing Range, and The Need to Avoid Unwarranted Sentence Disparities:

The Court should exercise it's discretion in this matter to grant a variance or depart downward to allow for a non-incacerative sentence. Despite the advisory guidelines that place Mr. Miniet in Group D as objected to but nonetheless contemplated in the PSIR, the Court after consideration of the PSIR and other documentation should consider that a sentence well below the guideline range is appropriate when considering just the facts of this case and the nature and circumstances of this particular defendant.  In examining the sentencing table, and the other § 3553 factors above and below, departure or variance is warranted after taking stock of all factors that militate to a sentence of probation for Mr. Miniet.

Other Grounds for Departure:

Pursuant to U.S.S.G. § 5H1.4,

Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the

guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., **in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment**.

U.S.S.G. § 5H1.4 (emphasis added).

Mr. Miniet is a 78-year-old male who has lived his life in the service of his fellow man. Mr. Miniet has faced many challenges in his early life in venturing to a foreign country that he embraced and embraced him as its own citizen. Since his arrest in this matter, Miniet has suffered four heart attacks and is also being evaluated for possible prostate cancer (he had a biopsy scheduled that was delayed due to the global pandemic). His mental and cognitive abilities have deteriorated over the course of these proceedings and the list of his infirmities continues to grow. By age group alone, Mr. Miniet presents at the highest risk category for death should he contract COVID 19. With that said, prisons and jails across the United States are breeding grounds for the virus as social distancing presents an almost impossible scenario while in custody.

**CORONAVIRUS PANDEMIC**

The United States is in the midst and possible first phase of an unprecedented health crisis. On March 11, 2020, the Director General of the World Health Organization ("WHO") characterized the spread of a novel coronavirus, COVID-19, as a global pandemic. See, *Who Director-General's opening remarks at the media briefing on COVID-19*, WHO, (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. COVID-19 is a respiratory virus which can

cause severe symptoms including high fever, severe cough, shortness of breath and pneumonia. According to the WHO, "approximately 14% develop severe disease requiring hospitalization and oxygen support and 5% require admission to an intensive care unit to try to prevent the most severe complications including septic shock – a significant drop in blood pressure that can lead to stroke, heart or respiratory failure, failure of other organs, or death." WHO Organization, Clinical Management of Severe Acute Respiratory Infection (SARI) when COVID-19 Disease is Suspected, March 13, 2020, https://www.who.int/publications-detail/clinical-management-of-severe-acute-respiratory-infection-when-novel-coronavirus-(ncov)-infection-is-suspected. COVID-19's unprecedented impact on the health of millions of people across the world is, tragically, all too apparent. See, World Health Organization, Coronavirus (COVID-19) (Apr. 23, 2020), available at https://covid19.who.int/. On March 13, 2020, the President of the United States declared a national emergency due to the spread of the virus. See White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, (Mar. 13, 2020), available at https://www.whitehouse.gov/presidentialactions/proclamation-declaring-national-emergency-concerning-novel-coronavirusdisease-covid-19-outbreak/. In April earlier this year, the country was still reeling with over 1,000,000 cases 68,000 deaths reported. *See*, Central for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the U.S. (Apr. 24, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. During this time, the virus has infiltrated many of the BOP's jails and prisons, affecting both those who are detained, as well as those who work inside these facilities. The nature of prisons – crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products – put those

incarcerated inside a facility with an outbreak at heightened risk. *See, United States v. Resnick*, No. 14-cr-810 (CM), 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020) (noting "the limitations in a prison environment . . . on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission"); *Center for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention .pdf ("Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and visitors."). For this reason, some medical professionals have warned that the highly infectious nature of COVID-19 in conjunction with a prison environment could amount to a ticking time bomb. *See Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020), available at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration (Prisons are petri dishes for contagious respiratory illnesses.").

**Rapid Spread of COVID-19**

COVID-19 is highly infectious. According to Dr. Chris Beyrer, a leading epidemiologist at Johns Hopkins University, "[O]nly the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity." *See*, Sworn Statement of Dr. Beyrer

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

at ¶ 10 attached hereto as Exhibit "A")[3] Jonathan L. Golob, M.D. a practicing physician and specialist in infectious diseases at the University of Michigan reports that "Nationally, without effective public health  interventions, CDC projections indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections." *See*, Sworn Statement of Dr. Golob at ¶ 10 attached hereto as Exhibit "B." From its emergence in December 2019 until today, the number of Coronavirus cases has jumped exponentially. The United States had one case as of January 22, 2020. As of April 2, 2020, the CDC reported a total of 13,144 cases and 4,513 deaths. *Cases in the U.S.*, CDC, April 2, 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-ushtml. As of May 5, 2020 the CDC was reporting a jump to over 1.17 million reported cases and over 68,000 deaths. Only 20 days later**, on May 25, 2020 those numbers have jumped to 1,622,114 total cases and 97,049 total death.** [4] https://www.cdc.gov/covid-data-tracker/index.html. It may kill 200,000 Americans and infect millions more. *Bobby Allyn, Fauci Estimates that 100,000 to 200,000 Americans Could Die from the Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/ fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

Worldwide, there were **900,306 confirmed cases and 45,693 confirmed deaths as of April 2, 2020.** The virus has impacted individuals in 206 countries, areas, or territories. Coronavirus disease (COVID-19) Pandemic, WHO, https://www.who.int/

---

[3] The affidavits of Chris Beyrer, M.D and Jonathan Louis Golob, M.D. were filed as exhibits to the defendant's Expedited Motion to Revoke Detention Order, in Case No. 1:19-cr-341-DCN (D. Idaho March 18, 2020) and were not prepared specifically for Mr. Miniet; however, the facts contained therein apply and are helpful in resolving the matter *sub judice*.

[4] As of the time of the filing of this Motion, the United States has reported over 100,000 deaths associated with complications from the virus.

emergencies/diseases/novel-coronavirus-2019. **As of May 5, 2020, there were 3,588,773 reported cases and 248,503 deaths. Only 20 days later, as of May 25, 2020, Worldwide reported cases have sky rocketed to 5,034,922 with 330,269 deaths being reported.** https://weather.com/coronavirus/l/72f2a4c2e79d2c3301c4cc3effe1a886530a914fcf9bd46a 39a3785d23b06531.

**Prevention**

COVID-19 spreads from one individual to another through small droplets that can be transmitted by getting coughed or sneezed on or by touching an object or surface that someone previously coughed or sneezed on. *Coronavirus Overview*, WHO, https://www.who.int/health-topics/coronavirus#tab=tab_1. The CDC, WHO, and individual state departments of health have stated that the spread of COVID-19 can be achieved by social distancing. Social distancing requires, whenever possible, (1) remaining at home, (2) keeping at least six feet of distance from others, (3) avoiding large gatherings, (4) covering coughs and sneezes, (5) washing hands frequently or using an alcohol based rub, and (6) cleaning and disinfecting frequently touched surfaces. *See e.g.*, *How to Protect Yourself*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html; *Basic protective measures against the new coronavirus*, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public.

**Individuals at Highest Risk**

Dr. Chris Beyrer, has stated under oath regarding COVID-19 that "The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

associated with influenza infection," and "varies significantly depending on the presence of certain demographic and health factors." *See*, Sworn Statement of Dr. Beyrer attached hereto as Exhibit "A" at ¶¶ 5-6.) COVID-19 can place certain populations of persons severely ill and/or can result in death." *See,* Exhibits "A" and "B," Sworn Statements of Dr.'s Beyrer and Golob.

Dr. Beyrer also reports that "The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with **pre-existing medical conditions** including cardio-vascular disease, respiratory disease, diabetes, and **immune compromise**." (Exhibit "A" at ¶ 6)(emphasis added). *See also,* Exhibit "B" at ¶ 4 ("In the highest risk populations, the case fatality rate is about 15%."). The Centre for Evidence-Based Medicine reported that most acute viral infections, such as COVID-19, have three short-term effects on cardiovascular disease. Acute viral infections can (1) increase the risk of acute coronary syndromes due to the inflammatory response; (2) depress the myocardium leading to worsening heart failure; and (3) unmask heart arrhythmias. Jason Oke & Carl Heneghan, *Global Covid-19 Case Fatality Rates*, CEBM, Mar. 25, 2020, https://www.cebm.net/global-covid-19-case-fatality-rates/.

Men are faring worse than women during this COVID-19 pandemic according to statistics emerging from around the world. *See* Melissa Healy, *Why is coronavirus so much more deadly for men than for women?* Mar. 21, 2020, https://www.latimes.com/science/story/2020-03-21/why-is-the-coronavirus-more-deadly-for-men-than-for-women. The higher risk to men associated with the virus was also acknowledged by the White House on March 20, 2020, the White House COVID-19 Task Force director Dr. Deborah Birx "cited a report from Italy showing that men in nearly every age bracket were dying at higher rates than women." *Id.*

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

Similarly, an "analysis of all COVID-19 patient profiles in China from December 2019 to February 2020 suggest[ed] that men account[ed] for roughly 60% of those who are infected and become sick." *Id.* Further, The LA Times article also noted that "in a detailed accounting of 44,600 cases in mainland China as of Feb. 11, China's Center for Disease Control reported that the fatality rate among men with confirmed infections was roughly 65% higher than it was among women."*Id.* Dr. Golob's affidavit further describes the extraordinary measures that may be required to care for those individuals who are most vulnerable: "Most people in the higher risk categories," who contract COVID-19 "will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians." *See*, Sworn Statement of Dr. Golob attached hereto as Exhibit "B." Further, Dr. Golob states that high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurological damage, and loss of respiratory capacity." *Id*. at ¶ 4.


**Vulnerability of Inmates**

Dr. Golob confirms that "effective public health measures, including social distancing and hygiene for vulnerable populations, could reduce these numbers." *Id*. at ¶ 10. These measures are "extremely difficult" in a prison setting. *See*, sworn Statement of Dr. Beyrer at ¶ 17 attached hereto as Exhibit "A."("While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain."). Prisons by their

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

very nature are designed for confinement in groups[5]; unfortunately, this creates an ideal environment for the transmission of contagious disease.

> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater.
>
> When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

(*See*, Sworn Statement of Dr. Jaimie Meyer, 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020) at ¶ 9, attached hereto as Exhibit "C.") Individuals who are incarcerated are particularly vulnerable. Former Medical director at the Correctional Health Services at Rikers Island Dr. Jonathan Giftos, has described the risks:

> [Jails] are not closed systems; there is a tremendous flux of people in and out of the facility, including officers and other staff, who live in communities overwhelmed by positive cases. Mitigating efforts such as physical distancing and frequent hand-washing are impossible in jails. And it is impossible to effectively screen and isolate people who are symptomatic to protect others in custody . . . . . And if they do become positive, there is very limited medical care available to them. The only measure that will meaningfully impact the spread and harm of Coronavirus in the jail-system is to depopulate - to release as many as possible to continue their cases in the community - with a focus on those at highest risk of complications.

---

[5] Segregation and isolation were experimented with using the Pennsylvania Model in prisons in the 1800's; the end result being that inmates developed severe mental disorders and psychiatric breakdowns.

*CM Lander Joined Members of Congress to Call for Release of At Risk Inmates from Federal Jails*, NYC Council, Mar. 22, 2020, https://council.nyc.gov/brad-lander/2020/03/22/cm-lander-joined-members-of-congress-to-call-forrelease-of-at-risk-inmates-from-federal-jails/.

When outbreaks occur in prisons, this leads directly to increased spread beyond the confines of jail. *See,* Sworn Statement of  Dr. Beyrer at ¶ 12 attached hereto as Exhibit "A." "It is therefore an **urgent** priority in this  time of national public health emergency to reduce the number of persons in detention as quickly as possible." *Id.* at ¶ 17) (emphasis added).) COVID-19 has already appeared in multiple prisons in China. *Id.* at ¶ 15. COVID-19 has now arrived in our prisons. The ramifications for both the incarcerated population and correctional staff will be dire. "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities." (*See*, Exhibit "A," Statement of Dr. Beyrer at ¶ 13.) Social distancing and decontaminating surfaces is "virtually impossible." (*Id.*) Furthermore, "[t]he high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." (*Id.*) U.S. Detention Facilities already have a track record of mismanaging infectious diseases (*see Id.*), and the fact that it remains business as usual in our jails is highly troubling. At this moment in our national history there can be no doubt "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." *Id.* at ¶ 19. The Honorable District Court Judge Kathleen Williams, Southern District of Florida, cites to the aforementioned experts in a recent opinion regarding conditions in a local jail where the Court states that,

> Medical experts agree that a reduction in the population of correctional facilities is the best way to prevent the spread of

> COVID-19. The unrebutted testimony of all the experts cited by
> Plaintiffs—Doctors Golob, Meyer, Stern, Mishori, Greifinger,
> Chiao, Rottnek, Paredes and Greer—is the importance of either
> social distancing or reducing the population of inmates to better
> achieve social distancing (many call for both). (DE 80-14; DE
> 80-15; DE 80-16; DE 80-17; DE 80-18; DE 80-19; DE 80-20; DE
> 80-33; DE 80-34; DE 80-35).

*See,* April 30, 2020 Order of Judge Kathleen Williams, Swain, et al. v. Junior, et al., 1:20-cv-

21457-KMW [D.E. 100](*citing,* Joe Fox, *et al.*, *58,132 people have died from coronavirus in the*

*U.S.*, WASH. POST, (Mar. 27, 2020, updated Apr. 29, 2020),

https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/.

Judge Williams further indicates that [m]ost, if not all, experts also agree that jails and other

detention facilities were not designed or equipped to handle a large-scale pandemic that

spreads rapidly through populations in close quarters. *Id.* at fn 7.


**Steps Taken by Congress, Courts and Prosecutors to Protect Inmates**

As a result of continuing threat and shocking consequences of COVID-19 on the

inmate population and the need to "lower the curve", the President, members of Congress,

courts, and prosecutors across the country have recognized the need to release prisoners.

Locally, for example, in Miami-Dade County, as recently as May 5, 2020, undersigned

counsel was supplied a list of vulnerable inmates through the hard work from the Office of

Carlos J. Martinez, Office of the State Attorney, Katherine Fernandez Rundle, and

Corrections Health Services in conjunction with Jackson Health Systems and the Miami-

Dade Department of Corrections.  The list identifies inmates for the purpose of identifying

those that may be subject to a form of release.  There is also a national trend for taking action.

This is in addition to Miami-Dade County's prior reductions that had already taken place

earlier last month by reducing the population. https://www.wlrn.org/post/jails-lower-populations-activists-cautiously-applaud-new-approach-arrests#stream/0.

Nationally, the trend has also taken root; House Judiciary Chair Jerrold Nadler led a team calling on the Southern and Eastern Districts of New York to release at risk inmates from federal jails and to halt arrests for non-violent charges. In a separate letter to Attorney General William Barr, Nadler wrote: "We urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action." Stephen Rex Brown, *'Business as usual' for federal prosecutors despite coronavirus, Nadler writes, calling for release of inmates*, N.Y. Daily News, Mar. 20, 2020, http://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-storyhtml. Magistrate Judge Nat Cousins in the Northern District of California issued a criminal standing order in light of the novel coronavirus pandemic – Judge Cousins, acknowledging that "[t]his public health crisis is serious and urgent," reopened any detention hearing on the basis of the physical and mental health of the accused. *Criminal Case Standing Order Re: Procedure for Review of Detention Orders in Light of Coronavirus Pandemic*, (N.D. Cal. Mar. 16, 2020) (Cousins, M.J.).

On March 26, 2020, in response to the coronavirus threat, Attorney General William Barr directed the Bureau of Prisons to increase the use of home confinement among older inmates with underlying conditions as a means to mitigate the spread of coronavirus within the country's prison system. Attorney General Barr stated "I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic . . . [F]or some eligible

inmates, home confinement might be more effective in protecting their health." Courts throughout the United States, recognizing the extraordinary risk posed to the elderly and to those with underlying health conditions, are releasing inmates. *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Perez*, ECF No. 62, Case No. 1:19-cr-297 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, ECF No. 2798, Case No. 15-cr-95 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic") *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal., Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Matthaei*, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"). The idea or argument that an inmate should wait until there is a confirmed outbreak is ridiculous as pointed out by Judge Hixson from the Norther District of California. *See, In re Manrique*, 2020 WL 1307109, at *1 (N.D. Cal., Mar. 19, 2020).

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

> people are not being tested. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late. *Id.* at *1.

State level efforts to release of inmates in response to the coronavirus threat include:

California:

plans to release 3500 inmates; 17 Justin Wise, *California to release up to 3500 non-violent inmates amid coronavirus outbreak*, the Hill, Mar. 31, 2020,

https://thehill.com/homenews/state-watch/490498-california-to-release-3500-non-violent-inmates-amid-coronavirus-outbreak.

New York City:

has released 900 inmates; 18 John Bowden, *New York City has released 900 inmates in response to coronavirus pandemic*, the Hill, Mar. 31, 2020, https://thehill.com/homenews/state-watch/490444-new-york-city-has-released-900-inmates-in-response-to-coronavirus.

New Jersey:

will release 1000 inmates; Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times, Mar. 23, 2020, https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-releasehtml.

Ohio:

Cuyahoga County officials launched an early-release program two weeks ago after the county jail's medical director identified hundreds of county prisoners with serious health conditions. The result: In a matter of days, the county jail population dropped from nearly 1,900 to less than 1,300. Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times, Mar. 23, 2020, https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-releasehtml.

Oregon:

Washington County, outside Portland, **more than 120 inmates** were released from the local jail, freeing up enough space for each remaining inmate to stay in their own cell.

Wisconsin:

Racine **Sheriff Christopher Schmaling** has directed the local jail to stop accepting all new prisoners except those accused of violent felonies or of misdemeanor crimes, such as domestic violence, that pose a threat to public safety. *See,* Kimberly Kindy, Emma Brown, & Dalton Bennett, *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat*, the Washington Post, Mar. 25, 2020, https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

U.S. v. Ralph Miniet, 15-CR-00043-GFVT-HAI

Pennsylvania:

Mercer County, the county jail released 60 of 308inmates — nearly one in five — to free up two cell blocks for the quarantine of anyone exposed or infected with the coronavirus. *Id.* Also, Pennsylvania District Attorney Larry Krasner advised that his office would seek torelease most individuals charged with nonviolent offenses or misdemeanorswithout requiring they post bail. In a further effort to reduce crowding in jails, Krasner also encouraged police officers to exercise discretion before charging individuals. Samantha Melamed & Mike Newall, *With courts closed by pandemic, Philly police stop low-level arrests to manage jail crowding*, The Philadelphia Inquirer, Mar. 18, 2020, https://www.inquirer.com/health/coronavirus/philadelphia-police-coronavirus-covid-pandemic-arrests-jail-overcrowding-larry-krasner-20200317html.

Oklahoma:

Public defenders and prosecutors in Tulsa, Oklahoma worked together to release 75 people from jail in a single day.*Cary Aspinwall, Keri Blakinger, Abbie Vansickle, and Christie Thompson*, Coronavirus Transforming Jails Across the Country, The Marshall Project, Mar. 21, 2020

**BOP NUMBERS IN GENERAL**

The BOP has 140,708 federal inmates in BOP-managed institutions and 10,817 in community-based facilities. See, https://www.bop.gov/coronavirus/. The BOP staff complement is approximately 36,000. As of March 31, 2020, BOP had **94 inmates** and staff at Bureau of Prisons facilities in 13 states have tested positive for COVID-19. https://www.themarshallproject.org/2020/03/21/coronavirus-transforming-jails-across-

the-country. Michael Balsamo & Michael R. Sisak, *Federal inmates to be locked in cells for 14 days amid virus, the Washington Post,* Apr. 1, 2020, https://www.washingtonpost.com/politics/federal-inmates-to-be-locked-in-cells-for-14-days-amid-virus/2020/04/01/99b9eb22-7457-11ea-ad9b-54ec99993bc_storyhtml. As of **May 6, 2020**, there were **2100** federal inmates and **365** BOP staff who have confirmed positive test results for COVID-19 nationwide. *See,* https://www.bop.gov/coronavirus/.(May 6th, 2020). The numbers are growing at an alarming exponential rate. **On May 25, 2020 BOP reported 1,558 federal inmates and 186 BOP staff who have confirmed positive test results for COVID-19 nationwide. It appears they do not count "recovered" inmates as a confirmed positive test. That number is now "3,144 inmates and 403 staff have recovered".**[6] There have been 59 federal inmate deaths and 0 BOP staff member deaths attributed to COVID-19 disease. *Id.* It should be noted that "inmate totals listed do not include inmates participating in the Federal Location Monitoring program, inmates supervised under the USPO, or being held in privately managed prisons." *Id.*

Mr. Miniet's age and infirmities place him at the highest risk of morbidity should he contract the virus.  Based on the above, exceptional circumstances exist to not impose a sentence involving incarceration by granting a significant departure/variance.

## CONCLUSION & RECOMMENDATION

9.      Mr. Miniet, a true first-time offender, appears before the Court after having pled guilty to Conspiracy to Distribute Oxycodone, 21 U.S.C. § 846, a Class C felony, and Count Two: Money Laundering, 18 U.S.C. 1956(h), a Class C felony. He has accepted

---

[6] Adding the two numbers, the total inmate cases **has more than doubled in 20 days to over 4,600.**

responsibility in the form of entering a *nolo contendere* plea and has also voluntarily relinquished his license to practice medicine. Mr.  Miniet is a 78-year-old male who has lived his life in the service of his fellow man.  He has accepted responsibility for his actions; further, Mr. Miniet has zero criminal history points and a criminal history category of I.  There remain unresolved issues guideline calculations as outlined in Defendant's Responses and Objections to the PSIR; however, once the Court determines a guideline range, Mr. Miniet requests the court determine an appropriate sentence that is supported by all relevant factors specific to this defendant. .

10.     Mr. Miniet respectfully asks this Court to impose a sentence below the advisory guideline range that is "reasonable but not greater than necessary" based on the advisory guideline range, PSIR, the Objections thereto, the Sentencing Memorandum, the Plea Agreement, applicable case law cited, and Title 18 USC § 3553(a) and all the factors that warrant a departure; Mr. Miniet suggests that a sentence without incarceration is appropriate under the facts of this particular case and when examining this particular defendant and all sentencing factors.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **May 27, 2020,** I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission Notices of Electronic Filing generated by CM/ECF.

**RESPECTFULLY SUBMITTED BY:**

**Prieto Law Firm**
1 Northeast 2nd Ave. Suite 200
Miami, FL 33132
Phone: 305-577-3440
Fax:    305-358-2503
Florida Bar No.: 0514071
frank@frankprietolaw.com

By:    **/s/ Frank Andrew Prieto**
        FRANK A. PRIETO, Esq.

# EXHIBIT "A"

# EXHIBIT B

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US. As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection. The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again, is likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release. Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.

_____
Professor Chris Beyrer[1]

---

[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

**References**

Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available. PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151

# EXHIBIT "B"

# EXHIBIT C

Case: 6:15-cr-00043-GFVT-HAI Doc #: 398 Filed: 05/27/20 Page: 38 of 66 - Page ID#:
Case 1:95-cr-00605-PAS Document 1320 Entered on FLSD Docket 03/19/2020 Page 15 of 42
2563

# DECLARATION OF DR. JONATHAN LOUIS GOLOB

I, Jonathan Louis Golob, declare as follows:

1. I am an Assistant Professor at the University of Michigan School of Medicine in Ann
   Arbor, Michigan, where I am a specialist in infectious diseases and internal medicine. At
   the University of Michigan School of Medicine, I am a practicing physician and a
   laboratory-based scientist. My primary subspecialization is for infections in
   immunocompromised patients, and my recent scientific publications focus on how
   microbes affect immunocompromised people. I obtained my medical degree and
   completed my residency at the University of Washington School of Medicine in Seattle,
   Washington, and also completed a Fellowship in Internal Medicine Infectious Disease at
   the University of Washington. I am actively involved in the planning and care for patients
   with COVID-19. Attached as Exhibit A is a copy of my curriculum vitae.

2. COVID-19 is a novel zoonotic coronavirus that has been identified as the cause of a viral
   outbreak that originated in Wuhan, China in December 2019. The World Health
   Organization has declared that COVID-19 is causing a pandemic. As of March 12, 2020,
   there are over 140,000 confirmed cases of COVID-19. COVID-19 has caused over 5,000
   deaths, with exponentially growing outbreaks occurring at multiple sites worldwide,
   including within the United States.

3. COVID-19 makes certain populations of people severely ill. People over the age of fifty
   are at higher risk, with those over 70 at serious risk. As the Center for Disease Control
   and Prevention has advised, certain medical conditions increase the risk of serious
   COVID-19 for people of any age. These medical conditions include: those with lung
   disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV,
   autoimmune diseases), blood disorders (including sickle cell disease), chronic liver or
   kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy.

4. For all people, even in advanced countries with very effective health care systems such as
   the Republic of Korea, the case fatality rate of this infection is about ten fold higher than
   that observed from a severe seasonal influenza. In the more vulnerable groups, both the
   need for care, including intensive care, and death is much higher than we observe from
   influenza infection: In the highest risk populations, the case fatality rate is about 15%.
   For high risk patients who do not die from COVID-19, a prolonged recovery is expected
   to be required, including the need for extensive rehabilitation for profound
   deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity that
   can be expected from such a severe illness.

5. In most people, the virus causes fever, cough, and shortness of breath. In high-risk individuals as noted above, this shortness of breath can often be severe. Even in younger and healthier people, infection of this virus requires supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

6. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians. This level of support can quickly exceed local health care resources.

7. The COVID-19 virus can severely damage the lung tissue, requiring an extensive period of rehabilitation and in some cases a permanent loss of respiratory capacity. The virus also seems to target the heart muscle itself, causing a medical condition called mycocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, which reduces the heart's ability to pump, leading to rapid or abnormal heart rhythms in the short term, and heart failure that limits exercise tolerance and the ability to work lifelong. There is emerging evidence that the virus can trigger an over-response by the immune system in infected people, further damaging tissues. This cytokine release syndrome can result in widespread damage to other organs, including permanent injury to the kidneys (leading to dialysis dependence) and neurologic injury.

8. There is no vaccine for this infection. Unlike influenza, there is no known effective antiviral medication to prevent or treat infection from COVID-19. Experimental therapies are being attempted. The only known effective measures to reduce the risk for a vulnerable person from injury or death from COVID-19 are to prevent individuals from being infected with the COVID-19 virus. Social distancing, or remaining physically separated from known or potentially infected individuals, and hygiene, including washing with soap and water, are the only known effective measures for protecting vulnerable communities from COVID-19.

9. COVID-19 is known to be spreading in the Seattle, Washington-area community. As of March 11, 2020 there are 270 confirmed cases of COVID-19 (an increase of 36 from March 10, 2020) and twenty-seven deaths from COVID-19 in the Seattle area. This

represents the largest known outbreak in the United States, and one the largest known outbreaks in the world as of March 12, 2020.

10. Nationally, without effective public health interventions, CDC projections indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections. Effective public health measures, including social distancing and hygiene for vulnerable populations, could reduce these numbers.

11. Based on the recovered genomes of the virus from the community analyzed by the Nextstrain project run by Dr. Trevor Bedford of the Fred Hutchinson Cancer Research Center in Seattle, it is known that the infection is being shared from person to person in and around Seattle. COVID-19 strains have specifically traced infection between residents and staff members of a skilled nursing facility in the Seattle area. This evidence suggests that COVID-19 is capable of spreading rapidly in institutionalized settings. The highest known person-to-person transmission rates for COVID-19 are in a skilled nursing facility in Kirkland, Washington and on afflicted cruise ships in Japan and off the coast of California. The strain of virus spreading in the Seattle area is genetically related to the strain of virus that spread readily on the cruise ships.

12. The COVID-19 outbreak in Seattle has resulted in the need for unprecedented public health measures, including multiple efforts to facilitate and enforce social distancing. These include encouraging employees to work from home, bans of gathering of more than 250 people, closure of schools, closure of the University of Washington campus in Seattle, limitations of visitation to skilled nursing facilities, and cancellation of major public events. Individuals have been asked to delay or cancel health care procedures in order to free up capacity within the system.

13. During the H1N1 influenza ("Swine Flu") epidemic in 2009, jails and prisons were sites of severe outbreaks of viral infection. Given the avid spread of COVID-19 in skilled nursing facilities and cruise ships, it is reasonable to expect COVID-19 will also readily spread in detention centers, particularly when residents cannot engage in proper hygiene and isolate themselves from infected residents or staff.

14. This information provides many reasons to conclude that vulnerable people, people over the age of 50 and people of any age with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune diseases), blood disorders (including sickle cell disease), chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy living in an institutional setting,

such as an immigration detention center, with limited access to adequate hygiene facilities and exposure to potentially infected individuals from the community are at grave risk of severe illness and death from COVID-19.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day in March, 2020 in Ann Arbor, Michigan.

Dr. Jonathan Louis Golob

# EXHIBIT "C"

Case 1:16-cr-00694-RA Document 47-4 Filed 04/03/209 Page 1 of 24

# EXHIBIT D

<u>**Declaration of Dr. Jaimie Meyer**</u>

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

## I.    **Background and Qualifications**

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine. I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut. In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility. Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole). I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others. I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I am being paid $1,000 for my time reviewing materials and preparing this report.

6. I have not testified as an expert at trial or by deposition in the past four years.

## II.    **Heightened Risk of Epidemics in Jails and Prisons**

1

Case: 6:15-cr-00043-CRY-HAI Doc #: 398-4 Filed: 05/27/20 Page: 45 of 66 2 Page ID#:
2570
Case 0:18-cr-00694-RA Document 474 Filed 04/03/20 Page 3 of 24

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. Reduced prevention opportunities: Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. Disciplinary segregation or solitary confinement is not an effective disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. Reduced prevention opportunities: During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. Reduced prevention opportunities: During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have

access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility</u>: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## III. Profile of COVID-19 as an Infectious Disease[4]

20. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer. People in prison and jail will likely have even less access to these novel health strategies as they become available.

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012),
https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.
[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.
[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

4

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5] Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6] Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7] People with mild symptoms may not require hospitalization but may continue to be closely monitored at home. People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen. People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation. Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Jails and prisons are totally under-resourced to meet the demand for any of these strategies. As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease. Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now. Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19. News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8] To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.* The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

Case: 6:15-cr-00043-GFVT-HAI  Doc #: 398-4  Filed: 05/27/20  Page: 49 of 66 2 Page ID#:
Case 0:18-cv-00694-RA  Document 47-4  Filed: 04/03/20  Page 7 of 24  Page ID#:
2574

place.[9]  Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV.     Risk of COVID-19 in ICE's NYC-Area Detention Facilities

25. I have reviewed the following materials in making my assessment of the danger of COVID-19 in the Bergen, Essex, Hudson, and Orange County jails ("ICE's NYC-area jails"): (1) a declaration by Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest (NYLPI); (2) the report *Detained and Denied: Healthcare Access in Immigration Detention*, released by NYLPI in 2017; and (3) the report *Ailing Justice*: *New Jersey, Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, released by Human Rights First in 2018.

26.  Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. The reasons for this conclusion are detailed as follows.

27. The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

28. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

29. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

30. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

---

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

31. Failure to keep accurate and sufficient medical records will make it more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection. Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

32. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

33. The commonplace neglect of individuals with acute pain and serious health needs under ordinary circumstances is also strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

34. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

35. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

## V.   Conclusion and Recommendations

36. For the reasons above, it is my professional judgment that individuals placed in ICE's NYC-area jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

37. Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large.

38. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

39. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60. They are in even greater danger in these facilities, including a meaningfully higher risk of death.

40. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks. Once a case of

Case: 6:15-cr-00043-GFVT-HAI   Doc #: 398   Filed: 05/27/20   Page: 51 of 66 - Page ID#:
2576
Case 1:18-cr-00694-RA   Document 47-4   Filed 04/03/20   Page 9 of 24

COVID-19 identified in a facility, it will likely be too late to prevent a widespread outbreak.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.


I declare under penalty of perjury that the foregoing is true and correct.


March 15, 2020
New Haven, Connecticut                                    Dr. Jaimie Meyer

# EXHIBIT A

Jaimie Meyer, MD, MS, FACP

# CURRICULUM VITAE

Date of Revision:          November 20, 2019
Name:                      Jaimie Meyer, MD, MS, FACP
School:                    Yale School of Medicine

## Education:

BA, Dartmouth College Anthropology 2000
MD, University of Connecticut School of Medicine 2005
MS, Yale School of Public Health Biostatistics and Epidemiology 2014

## Career/Academic Appointments:

| | |
|---|---|
| 2005 - 2008 | Residency, Internal Medicine, NY Presbyterian Hospital at Columbia, New York, NY |
| 2008 - 2011 | Fellowship, Infectious Diseases, Yale University School of Medicine, New Haven, CT |
| 2008 - 2012 | Clinical Fellow, Infectious Diseases, Yale School of Medicine, New Haven, CT |
| 2010 - 2012 | Fellowship, Interdisciplinary HIV Prevention, Center for Interdisciplinary Research on AIDS, New Haven, CT |
| 2012 - 2014 | Instructor, AIDS, Yale School of Medicine, New Haven, CT |
| 2014 - present | Assistant Professor, AIDS, Yale School of Medicine, New Haven, CT |
| 2015 - 2018 | Assistant Clinical Professor, Nursing, Yale School of Medicine, New Haven, CT |

## Board Certification:

AB of Internal Medicine, Internal Medicine, 08-2008, 01-2019
AB of Internal Medicine, Infectious Disease, 10-2010
AB of Preventive Medicine, Addiction Medicine, 01-2018

## Professional Honors & Recognition:

### International/National/Regional

| | |
|---|---|
| 2018 | NIH Center for Scientific Review, Selected as Early Career Reviewer |
| 2017 | Doris Duke Charitable Foundation, Doris Duke Charitable Foundation Scholar |
| 2016 | American College of Physicians, Fellow |
| 2016 | NIH Health Disparities, Loan Repayment Award Competitive Renewal |
| 2016 | AAMC, Early Career Women Faculty Professional Development Seminar |
| 2014 | NIH Health Disparities, Loan Repayment Program Award |
| 2014 | NIDA, Women & Sex/Gender Differences Junior Investigator Travel Award |
| 2014 | International Women's/Children's Health & Gender Working Group, Travel Award |
| 2014 | Patterson Trust, Awards Program in Clinical Research |
| 2013 | Connecticut Infectious Disease Society, Thornton Award for Clinical Research |
| 2011 | Bristol Myers-Squibb, Virology Fellows Award |

1

Case: 6:15-cr-00042-GFVT-HAI   Doc #: 398-4   Filed: 05/27/20   Page: 54 of 66 - Page ID#:
Case 9:18-cr-00694-RA   Document 41   Filed 04/03/20   Page 126 of 22
2579

Jaimie Meyer, MD, MS, FACP

| 2006 | NY Columbia Presbyterian, John N. Loeb Intern Award |
| 2005 | American Medical Women's Association, Medical Student Citation |
| 2005 | Connecticut State Medical Society, Medical Student Award |
| 2000 | Dartmouth College, Hannah Croasdale Senior Award |
| 2000 | Dartmouth College, Palaeopitus Senior Leadership Society Inductee |

## Yale University
| 2014 | Women's Faculty Forum, Public Voices Thought Leadership Program Fellow |

## Grants/Clinical Trials History:

### Current Grants

| Agency: | Center for Interdisciplinary Research on AIDS (CIRA) |
| I.D.#: | 2019-20 Pilot Project Awards |
| Title: | Optimizing PrEP's Potential in Non-Clinical Settings: Development and Evaluation of a PrEP Decision Aid for Women Seeking Domestic Violence Services |
| P.I.: | Tiara Willie |
| Role: | Principal Investigator |
| Percent effort: | 2% |
| Direct costs per year: | $29,993.00 |
| Total costs for project period: | $29,993.00 |
| Project period: | 7/11/2019 - 7/10/2020 |

| Agency: | SAMHSA |
| I.D.#: | H79 TI080561 |
| Title: | CHANGE: Comprehensive Housing and Addiction Management Network for Greater New Haven |
| Role: | Principal Investigator |
| Percent effort: | 20% |
| Direct costs per year: | $389,054.00 |
| Total costs for project period: | $1,933,368.00 |
| Project period: | 11/30/2018 - 11/29/2023 |

| Agency: | Gilead Sciences, Inc. |
| I.D.#: | Investigator Sponsored Award, CO-US-276-D136 |
| Title: | Delivering HIV Pre-Exposure Prophylaxis to Networks of Justice-Involved Women |
| Role: | Principal Investigator |
| Percent effort: | 8% |
| Direct costs per year: | $81,151.00 |
| Total costs for project | |

Jaimie Meyer, MD, MS, FACP

| | |
|---|---|
| period: | $306,199.00 |
| Project period: | 6/19/2018 - 1/31/2020 |

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | R21 DA042702 |
| Title: | Prisons, Drug Injection and the HIV Risk Environment |
| Role: | Principal Investigator |
| Percent effort: | 22% |
| Direct costs per year: | $129,673.00 |
| Total costs for project period: | $358,276.00 |
| Project period: | 8/1/2017 - 7/31/2020 |

| | |
|---|---|
| Agency: | Doris Duke Charitable Foundation |
| I.D.#: | Clinical Scientist Development Award |
| Title: | Developing and Testing the Effect of a Patient-Centered HIV Prevention Decision Aid on PrEP uptake for Women with Substance Use in Treatment Settings |
| Role: | Principal Investigator |
| Percent effort: | 27% |
| Direct costs per year: | $149,959.00 |
| Total costs for project period: | $493,965.00 |
| Project period: | 7/1/2017 - 6/30/2020 |

## Past Grants

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | K23 DA033858 |
| Title: | Evaluating and Improving HIV Outcomes in Community-based Women who Interface with the Criminal Justice System |
| Role: | Principal Investigator |
| Percent effort: | 75% |
| Direct costs per year: | $149,509.00 |
| Total costs for project period: | $821,147.00 |
| Project period: | 7/1/2012 - 11/30/2017 |

| | |
|---|---|
| Agency: | Robert Leet & Clara Guthrie Patterson Trust |
| I.D.#: | R12225, Award in Clinical Research |
| Title: | Disentangling the Effect of Gender on HIV Treatment and Criminal Justice Outcomes |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $75,000.00 |

Jaimie Meyer, MD, MS, FACP

| | |
|---|---|
| Total costs for project period: | $75,000.00 |
| Project period: | 1/31/2014 - 10/31/2015 |
| | |
| Agency: | Bristol-Myers Squibb |
| I.D.#: | HIV Virology Fellowship Award |
| Title: | Effect of newer antiretroviral regimens on HIV biological outcomes in HIV-infected prisoners: a 13 year retrospective evaluation |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $34,390.00 |
| Total costs for project period: | $34,390.00 |
| Project period: | 12/1/2011 - 11/30/2012 |

## Pending Grants

| | |
|---|---|
| Agency: | NIMH |
| I.D.#: | R01 MH121991 |
| Title: | Identifying Modifiable Risk and Protective Processes at the Day-Level that Predict HIV Care Outcomes among Women Exposed to Partner Violence |
| P.I.: | Sullivan, Tami |
| Role: | Principal Investigator |
| Percent effort: | 30% |
| Direct costs per year: | $499,755.00 |
| Total costs for project period: | $4,148,823.00 |
| Project period: | 1/1/2020 - 12/31/2024 |

## Invited Speaking Engagements, Presentations, Symposia & Workshops Not Affiliated With Yale:

### International/National

2019:   CME Outfitters, Washington, DC. "A Grassroots Approach to Weed out HIV and HCV in Special OUD Populations"

2019:   US Commission on Civil Rights, Washington, DC. "An Analysis of Women's Health, Personal Dignity and Sexual Abuse in the US Prison System"

2018:   College of Problems on Drug Dependence, College of Problems on Drug Dependence, San Diego, CA. "Research on Women who Use Drugs: Knowledge and Implementation Gaps and A Proposed Research Agenda"

2018:   Clinical Care Options, Washington, DC. "Intersection of the HIV and Opioid Epidemics"

2016:   Dartmouth Geisel School of Medicine, Hanover, NH. "Incarceration as Opportunity: Prisoner Health and Health Interventions"

2010:   Rhode Island Chapter of the Association of Nurses in AIDS Care, Providence, RI. "HIV and Addiction"

Jaimie Meyer, MD, MS, FACP

Regional

2018:   Clinical Directors Network, New York, NY. "PrEP Awareness among Special Populations of Women and People who Use Drugs"

2018:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "HIV prevention for justice-involved women"

2017:   Clinical Directors Network, New York, NY. "Optimizing the HIV Care Continuum for People who use Drugs"

2016:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "Topics in Infectious Diseases"

2016:   Connecticut Advanced Practice Registered Nurse Society, Wethersfield, CT. "Trends in HIV Prevention: Integration of Biomedical and Behavioral Approaches"

## Peer-Reviewed Presentations & Symposia Given at Meetings Not Affiliated With Yale:

### International/National

2019:   CPDD 81st Annual Scientific Meeting, CPDD, San Antonio, TX. "Punitive approaches to pregnant women with opioid use disorder: Impact on health care utilization, outcomes and ethical implications"

2019:   14th International Conference on HIV Treatment and Prevention Adherence, IAPAC Adherence, Miami, FL. "Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP Contextually Relevant?"

2019:   2019 NIDA International Forum, NIDA, San Antonio, TX. "Diphenhydramine Injection in Kyrgyz Prisons: A Qualitative Study Of A High-Risk Behavior With Implications For Harm Reduction"

2019:   11th International Women's and Children's Health and Gender (InWomen's) Group, InWomen's Group, San Antonio, TX. "Uniquely successful implementation of methadone treatment in a women's prison in Kyrgyzstan"

2019:   Harm Reduction International, Porto, Porto District, Portugal. "How does methadone treatment travel? On the 'becoming-methadone-body' of Kyrgyzstan prisons"

2019:   APA Collaborative Perspectives on Addiction Annual Meeting, APA Collaborative Perspectives on Addiction Annual Meeting, Providence, RI. "Impact of Trauma and Substance Abuse on HIV PrEP Outcomes among Women in Criminal Justice Systems. Symposium: "Partner Violence: Intersected with or Predictive of Substance Use and Health Problems among Women.""

2019:   Society for Academic Emergency Medicine (SAEM), Worcester, MA. "Effects of a Multisite Medical Home Intervention on Emergency Department Use among Unstably Housed People with Human Immunodeficiency Virus"

2019:   Conference on Retroviruses and Opportunistic Infections (CROI), IAS, Seattle, WA. "Released to Die: Elevated Mortality in People with HIV after Incarceration"

2019:   12th Academic and Health Policy on Conference on Correctional Health, 12th Academic and Health Policy on Conference on Correctional Health, Las Vegas, NV. "PrEP Eligibility and HIV Risk Perception for Women across the Criminal Justice Continuum in Connecticut"

2019:   Association for Justice-Involved Female Organizations (AJFO), Atlanta, GA. "Treatment of Women's Substance Use Disorders and HIV Prevention During and Following Incarceration"

Jaimie Meyer, MD, MS, FACP

2018:   American Public Health Association (APHA) Annual Meeting, American Public Health Association (APHA) Annual Meeting, San Diego, CA. "New Haven Syringe Service Program: A model of integrated harm reduction and health care services"

2018:   12th National Harm Reduction Conference, 12th National Harm Reduction Conference, New Orleans, LA. "Service needs and access to care among participants in the New Haven Syringe Services Program"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "HIV risk perceptions and risk reduction strategies among prisoners in Kyrgyzstan: a qualitative study"

2018:   22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "Methadone Maintenance Therapy Uptake, Retention, and Linkage for People who Inject Drugs Transitioning From Prison to the Community in Kyrgyzstan: Evaluation of a National Program"

2018:   NIDA International Forum, NIDA, San Diego, CA. "HIV and Drug Use among Women in Prison in Azerbaijan, Kyrgyzstan and Ukraine"

2018:   2018 Conference on Retroviruses and Opportunistic Infections (CROI), CROI, Boston, MA. "From prison's gate to death's door: Survival analysis of released prisoners with HIV"

2018:   11th Academic and Health Policy on Conference on Correctional Health, Academic Consortium on Criminal Justice Health, Houston, TX. "Assessing Concurrent Validity of Criminogenic and Health Risk Instruments among Women on Probation in Connecticut"

2017:   IDWeek: Annual Meeting of Infectious Diseases Society of America, Infectious Diseases Society of America, San Diego, CA. "Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons (Oral presentation)"

2017:   International AIDS Society (IAS) Meeting, International AIDS Society, Paris, Île-de-France, France. "Late breaker: Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons"

2017:   NIDA International Forum, NIDA, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "Assessing Receptiveness to and Eligibility for PrEP in Criminal Justice-Involved Women"

2017:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:   Annual Meeting of the Society for Applied Anthropology, Society for Applied Anthropology, Santa Fe, NM. "Where rubbers meet the road: HIV risk reduction for women on probation (Oral presentation)"

2016:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Palm Springs, CA. "An Event-level Examination of Successful Condom Negotiation Strategies among College Women"

2015:   CDC National HIV Prevention Conference, CDC, Atlanta, GA. "Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence (Oral presentation)"

Case: 6:15-cr-00042-GFVT-HAI   Doc #: 298-4 Filed: 05/27/20   Page: 59 of 66 - Page ID#:
Case: 1:18-cr-00694-RA   Document 47   Filed: 04/03/20   Page 17 of 24
2584

Jaimie Meyer, MD, MS, FACP

2015:   International Harm Reduction Conference, International Harm Reduction, Kuala Lumpur,
Federal Territory of Kuala Lumpur, Malaysia. "Evidence-Based Interventions to Enhance
Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum"

2015:   International Women's and Children's Health and Gender Working Group, International
Women's and Children's Health and Gender Working Group, Phoenix, AZ. "Violence, Substance
Use, and Sexual Risk among College Women"

2014:   International Women's and Children's Health and Gender Working Group, International
Women's and Children's Health and Gender Working Group, San Juan, San Juan, Puerto Rico.
"Gender Differences in HIV and Criminal Justice Outcomes"

2014:   College on Problems in Drug Dependence (CPDD), College on Problems in Drug Dependence
(CPDD), San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice
Outcomes"

2014:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses
and Opportunistic Infections (CROI), Boston, MA. "Longitudinal Treatment Outcomes in HIV-
Infected Prisoners and Influence of Re-Incarceration"

2013:   HIV Intervention and Implementation Science Meeting, HIV Intervention and Implementation
Science Meeting, Bethesda, MD. "Women Released from Jail Experience Suboptimal HIV
Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2013:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses
and Opportunistic Infections (CROI), Atlanta, GA. "Women Released from Jail Experience
Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of
America, San Diego, CA. "Correlates of Retention in HIV Care after Release from Jail: Results
from a Multi-site Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of
America, San Diego, CA. "Frequent Emergency Department Use among Released Prisoners with
HIV: Characterization Including a Novel Multimorbidity Index"

2012:   5th Academic and Health Policy Conference on Correctional Health, 5th Academic and Health
Policy Conference on Correctional Health, Atlanta, GA. "Effects of Intimate Partner Violence on
HIV and Substance Abuse in Released Jail Detainees"

2011:   IAPAC HIV Treatment and Adherence Conference, IAPAC, Miami, FL. "Adherence to HIV
treatment and care among previously homeless jail detainees"


## Regional

2019:   Connecticut Infectious Disease Society, New Haven, CT. "Preliminary Findings from a Novel
PrEP Demonstration Project for Women Involved in Criminal Justice Systems and Members of
their Risk Networks"

2017:   Connecticut Public Health Association Annual Conference, Connecticut Public Health
Association, Farmington, CT. "The New Haven syringe services program"

2014:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society,
Orange, CT. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-
Incarceration"

Case: 6:15-cr-00042-GFVT-HAI Doc #: 398-4 Filed: 05/27/20 Page: 60 of 66 - Page ID#:
Case 9:18-cr-80894-RA Document 4 Filed: 04/03/2009 Page 180 of 2
2585

Jaimie Meyer, MD, MS, FACP

2013:    Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society,
         Orange, CT. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes
         Compared to Men: Results from a Multi-Center Study"
2011:    Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society,
         Orange, CT. "Emergency Department Use by Released Prisoners with HIV"

## Professional Service:

## Peer Review Groups/Grant Study Sections

2019 - present    Reviewer, NIDA, NIH Reviewer: RFA-DA-19-025: HEAL Initiative: Justice Community
                  Opioid Innovation Network (JCOIN) Clinical Research Centers
2019 - present    Reviewer, Yale DCFAR Pilot Projects
2018 - present    Reviewer, Center for Interdisciplinary Research on AIDS (CIRA)
2015 - present    Reviewer, University of Wisconsin-Milwaukee Research Growth Initiative

## Advisory Boards

2017             Advisor, HIV Prevention and Treatment in Cis-Gendered Women, Gilead Sciences, Inc.

## Journal Service

### Editor/Associate Editor

2019 - present    Associate Editor, Journal of the International Association of Providers of AIDS Care
                  (JIAPAC), Section Editor: Sex and Gender Issues

### Reviewer

2019 - present    Reviewer, JAIDS
2012 - present    Reviewer, Addiction Sci and Clin Pract
2012 - present    Reviewer, Addictive Behav Reports
2012 - present    Reviewer, AIDS Care
2012 - present    Reviewer, Social Science and Medicine
2012 - present    Reviewer, SpringerPlus
2012 - present    Reviewer, Substance Abuse Treatment Prevention and Policy
2012 - present    Reviewer, Women's Health Issues
2012 - present    Reviewer, Yale Journal of Biology and Medicine
2012 - present    Reviewer, AIMS Public Health
2012 - present    Reviewer, American Journal on Addictions
2012 - present    Reviewer, American Journal of Epidemiology
2012 - present    Reviewer, American Journal of Public Health
2012 - present    Reviewer, Annals Internal Medicine
2012 - present    Reviewer, BMC Emergency Medicine
2012 - present    Reviewer, BMC Infectious Diseases
2012 - present    Reviewer, BMC Public Health
2012 - present    Reviewer, BMC Women's Health

| | |
|---|---|
| 2012 - present | Reviewer, Clinical Infectious Diseases |
| 2012 - present | Reviewer, Critical Public Health |
| 2012 - present | Reviewer, Drug and Alcohol Dependence |
| 2012 - present | Reviewer, Drug and Alcohol Review |
| 2012 - present | Reviewer, Epidemiologic Reviews |
| 2012 - present | Reviewer, Eurosurveillance |
| 2012 - present | Reviewer, Health and Justice (Springer Open) |
| 2012 - present | Reviewer, International Journal of Drug Policy |
| 2012 - present | Reviewer, International Journal of Prisoner Health |
| 2012 - present | Reviewer, International Journal of STDs and AIDS |
| 2012 - present | Reviewer, International Journal of Women's Health |
| 2012 - present | Reviewer, JAMA Internal Medicine |
| 2012 - present | Reviewer, Journal of Family Violence |
| 2012 - present | Reviewer, Journal of General Internal Medicine |
| 2012 - present | Reviewer, Journal of Immigrant and Minority Health |
| 2012 - present | Reviewer, Journal of International AIDS Society |
| 2012 - present | Reviewer, Journal of Psychoactive Drugs |
| 2012 - present | Reviewer, Journal of Urban Health |
| 2012 - present | Reviewer, Journal of Women's Health |
| 2012 - present | Reviewer, Open Forum Infectious Diseases |
| 2012 - present | Reviewer, PLoS ONE |
| 2012 - present | Reviewer, Public Health Reports |

## Professional Service for Professional Organizations

### AAMC Group on Women in Medicine and Science (GWIMS)

2016 - present     Member, AAMC Group on Women in Medicine and Science (GWIMS)

### American College of Physicians

2016 - present     Fellow, American College of Physicians
2013 - 2016        Member, American College of Physicians

### American Medical Association

2005 - present     Member, American Medical Association

### American Medical Women's Association

2011 - present     Member, American Medical Women's Association

### American Society of Addiction Medicine

2009 - present     Member, American Society of Addiction Medicine

Jaimie Meyer, MD, MS, FACP

*Connecticut Infectious Disease Society*
2011 - present     Member, Connecticut Infectious Disease Society

*Infectious Disease Society of America*
2008 - present     Member, Infectious Disease Society of America

*InWomen's Network, NIDA International Program*
2013 - present     Member, InWomen's Network, NIDA International Program

*New York State Medical Society*
2005 - 2008     Member, New York State Medical Society

## Yale University Service
*University Committees*
2016 - 2018     Council Member, Leadership Council, Women's Faculty Forum

*Medical School Committees*
2015 - 2016     Committee Member, US Health and Justice Course, Yale School of Medicine
2014 - present     Committee Member, Yale Internal Medicine Traditional Residency Intern Selection Committee

## Public Service
2019 - present     Faculty Member, Yale University Program in Addiction Medicine
2017 - present     Faculty Member, Arthur Liman Center for Public Interest Law, Yale Law School
2013 - present     Mentor, Women in Medicine at Yale Mentoring Program
2012 - present     Faculty Member, Yale Center for Interdisciplinary Research on AIDS
2009 - 2011     Instructor, Preclinical Clerkship Tutor, Yale School of Medicine
2002     Fellow, Soros Open Society Institute
1998 - 1999     Fellow, Costa Rican Humanitarian Foundation

## Bibliography:

### Peer-Reviewed Original Research
1. **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Emergency department use by released prisoners with HIV: an observational longitudinal study. PloS One 2012, 7:e42416.
2. Chen NE, **Meyer JP**, Bollinger R, Page KR. HIV testing behaviors among Latinos in Baltimore City. Journal Of Immigrant And Minority Health / Center For Minority Public Health 2012, 14:540-51.
3. Chitsaz E, **Meyer JP**, Krishnan A, Springer SA, Marcus R, Zaller N, Jordan AO, Lincoln T, Flanigan TP, Porterfield J, Altice FL. Contribution of substance use disorders on HIV treatment outcomes and antiretroviral medication adherence among HIV-infected persons entering jail. AIDS And Behavior 2013, 17 Suppl 2:S118-27.

Jaimie Meyer, MD, MS, FACP

4.  Chen NE, **Meyer JP**, Avery AK, Draine J, Flanigan TP, Lincoln T, Spaulding AC, Springer SA, Altice FL. Adherence to HIV treatment and care among previously homeless jail detainees. AIDS And Behavior 2013, 17:2654-66.

5.  Althoff AL, Zelenev A, **Meyer JP**, Fu J, Brown SE, Vagenas P, Avery AK, Cruzado-Quiñones J, Spaulding AC, Altice FL. Correlates of retention in HIV care after release from jail: results from a multi-site study. AIDS And Behavior 2013, 17 Suppl 2:S156-70.

6.  Williams CT, Kim S, **Meyer J**, Spaulding A, Teixeira P, Avery A, Moore K, Altice F, Murphy-Swallow D, Simon D, Wickersham J, Ouellet LJ. Gender differences in baseline health, needs at release, and predictors of care engagement among HIV-positive clients leaving jail. AIDS And Behavior 2013, 17 Suppl 2:S195-202.

7.  **Meyer JP**, Wickersham JA, Fu JJ, Brown SE, Sullivan TP, Springer SA, Altice FL. Partner violence and health among HIV-infected jail detainees. International Journal Of Prisoner Health 2013, 9:124-41.

8.  **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Frequent emergency department use among released prisoners with human immunodeficiency virus: characterization including a novel multimorbidity index. Academic Emergency Medicine : Official Journal Of The Society For Academic Emergency Medicine 2013, 20:79-88.

9.  **Meyer JP**, Cepeda J, Springer SA, Wu J, Trestman RL, Altice FL. HIV in people reincarcerated in Connecticut prisons and jails: an observational cohort study. The Lancet. HIV 2014, 1:e77-e84.

10. **Meyer JP**, Zelenev A, Wickersham JA, Williams CT, Teixeira PA, Altice FL. Gender disparities in HIV treatment outcomes following release from jail: results from a multicenter study. American Journal Of Public Health 2014, 104:434-41.

11. **Meyer JP**, Cepeda J, Wu J, Trestman RL, Altice FL, Springer SA. Optimization of human immunodeficiency virus treatment during incarceration: viral suppression at the prison gate. JAMA Internal Medicine 2014, 174:721-9.

12. **Meyer JP**, Cepeda J, Taxman FS, Altice FL. Sex-Related Disparities in Criminal Justice and HIV Treatment Outcomes: A Retrospective Cohort Study of HIV-Infected Inmates. American Journal Of Public Health 2015, 105:1901-10.

13. Boyd AT, Song DL, **Meyer JP**, Altice FL. Emergency department use among HIV-infected released jail detainees. Journal Of Urban Health : Bulletin Of The New York Academy Of Medicine 2015, 92:108-35.

14. Shrestha R, Karki P, Altice FL, Huedo-Medina TB, **Meyer JP**, Madden L, Copenhaver M. Correlates of willingness to initiate pre-exposure prophylaxis and anticipation of practicing safer drug- and sex-related behaviors among high-risk drug users on methadone treatment. Drug And Alcohol Dependence 2017, 173:107-116.

15. Peasant C, Sullivan TP, Weiss NH, Martinez I, **Meyer JP**. Beyond the syndemic: condom negotiation and use among women experiencing partner violence. AIDS Care 2017, 29:516-523.

16. Wickersham JA, Gibson BA, Bazazi AR, Pillai V, Pedersen CJ, **Meyer JP**, El-Bassel N, Mayer KH, Kamarulzaman A, Altice FL. Prevalence of Human Immunodeficiency Virus and Sexually Transmitted Infections Among Cisgender and Transgender Women Sex Workers in Greater Kuala Lumpur, Malaysia: Results From a Respondent-Driven Sampling Study. Sexually Transmitted Diseases 2017, 44:663-670.

17. Hoff E, Marcus R, Bojko MJ, Makarenko I, Mazhnaya A, Altice FL, **Meyer JP**. The effects of opioid-agonist treatments on HIV risk and social stability: A mixed methods study of women with opioid use disorder in Ukraine. Journal Of Substance Abuse Treatment 2017, 83:36-44.

Case: 6:15-cr-00042-GFVT-HAI Doc #: 398-4 Filed: 05/27/20 Page: 64 of 66 - Page ID#:
2589
Case 9:18-cr-00894-RA Document 4 Filed: 05/24/03/2009 Page 2 of 2

Jaimie Meyer, MD, MS, FACP

18. Rutledge R, Madden L, Ogbuagu O, **Meyer JP**. HIV Risk perception and eligibility for pre-exposure prophylaxis in women involved in the criminal justice system. AIDS Care 2018, 30:1282-1289.

19. Peasant C, Sullivan TP, Ritchwood TD, Parra GR, Weiss NH, **Meyer JP**, Murphy JG. Words can hurt: The effects of physical and psychological partner violence on condom negotiation and condom use among young women. Women & Health 2018, 58:483-497.

20. Loeliger KB, Altice FL, Desai MM, Ciarleglio MM, Gallagher C, **Meyer JP**. Predictors of linkage to HIV care and viral suppression after release from jails and prisons: a retrospective cohort study. The Lancet. HIV 2018, 5:e96-e106.

21. Odio CD, Carroll M, Glass S, Bauman A, Taxman FS, **Meyer JP**. Evaluating concurrent validity of criminal justice and clinical assessments among women on probation. Health & Justice 2018, 6:7.

22. Loeliger KB, Altice FL, Ciarleglio MM, Rich KM, Chandra DK, Gallagher C, Desai MM, **Meyer JP**. All-cause mortality among people with HIV released from an integrated system of jails and prisons in Connecticut, USA, 2007-14: a retrospective observational cohort study. The Lancet. HIV 2018, 5:e617-e628.

23. Loeliger KB, **Meyer JP**, Desai MM, Ciarleglio MM, Gallagher C, Altice FL. Retention in HIV care during the 3 years following release from incarceration: A cohort study. PLoS Medicine 2018, 15:e1002667.

24. Azbel L, Wegman MP, Polonsky M, Bachireddy C, **Meyer J**, Shumskaya N, Kurmanalieva A, Dvoryak S, Altice FL. Drug injection within prison in Kyrgyzstan: elevated HIV risk and implications for scaling up opioid agonist treatments. International Journal Of Prisoner Health 2018, 14:175-187.

25. Peasant C, Montanaro EA, Kershaw TS, Parra GR, Weiss NH, **Meyer JP**, Murphy JG, Ritchwood TD, Sullivan TP. An event-level examination of successful condom negotiation strategies among young women. Journal Of Health Psychology 2019, 24:898-908.

26. Ranjit YS, Azbel L, Krishnan A, Altice FL, **Meyer JP**. Evaluation of HIV risk and outcomes in a nationally representative sample of incarcerated women in Azerbaijan, Kyrgyzstan, and Ukraine. AIDS Care 2019, 31:793-797.

27. Rhodes T, Azbel L, Lancaster K, **Meyer J**. The becoming-methadone-body: on the onto-politics of health intervention translations. Sociology Of Health & Illness 2019, 41:1618-1636.

28. Olson B, Vincent W, **Meyer JP**, Kershaw T, Sikkema KJ, Heckman TG, Hansen NB. Depressive symptoms, physical symptoms, and health-related quality of life among older adults with HIV. Quality Of Life Research : An International Journal Of Quality Of Life Aspects Of Treatment, Care And Rehabilitation 2019.

## Chapters, Books, and Reviews

29. Azar MM, Springer SA, **Meyer JP**, Altice FL. A systematic review of the impact of alcohol use disorders on HIV treatment outcomes, adherence to antiretroviral therapy and health care utilization. Drug And Alcohol Dependence 2010, 112:178-93.

30. **Meyer JP**, Springer SA, Altice FL. Substance abuse, violence, and HIV in women: a literature review of the syndemic. Journal Of Women's Health (2002) 2011, 20:991-1006.

31. **Meyer JP**, Chen NE, Springer SA. HIV Treatment in the Criminal Justice System: Critical Knowledge and Intervention Gaps. AIDS Research And Treatment 2011, 2011:680617.

32. Springer SA, Spaulding AC, **Meyer JP**, Altice FL. Public health implications for adequate transitional care for HIV-infected prisoners: five essential components. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2011, 53:469-79.

Case: 6:15-cv-00042-GFVT-HAI   Doc #: 298-47 Filed: 05/27/20   Page: 65 of 66 - Page ID#:
2590
Case 9:18-cr-00694-RA   Document 41   Filed 12/04/03   Page 13 of 2

33. Chen NE, **Meyer JP**, Springer SA. Advances in the prevention of heterosexual transmission of HIV/AIDS among women in the United States. Infectious Disease Reports 2011, 3.

34. **Meyer J**, Altice F.  HIV in Injection and Other Drug Users.  Somesh Gupta, Bhushan Kumar, eds.  Sexually Transmitted Infections 2nd ed. New Delhi, India: Elsevier, 2012: 1061-80.  ISBN 978-81-312-2809-8.

35. **Meyer JP**, Althoff AL, Altice FL. Optimizing care for HIV-infected people who use drugs: evidence-based approaches to overcoming healthcare disparities. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2013, 57:1309-17.

36. **Meyer J**, Altice F.  Chapter 47, Treatment of Addictions: Transition to the Community.  Robert L. Trestman, Kenneth L. Appelbaum, Jeffrey L. Metzner, eds.  Oxford Textbook of Correctional Psychiatry (Winner of the 2016 Guttmacher Award).  Oxford University Press 2015.  ISBN 9780199360574.

37. **Meyer JP**, Moghimi Y, Marcus R, Lim JK, Litwin AH, Altice FL. Evidence-based interventions to enhance assessment, treatment, and adherence in the chronic Hepatitis C care continuum. The International Journal On Drug Policy 2015, 26:922-35.

38. Mohareb A, Tiberio P, Mandimika C, Muthulingam D, **Meyer J**.  Infectious Diseases in Underserved Populations.  Onyema Ogbuagu, Gerald Friedland, Merceditas Villanueva, Marjorie Golden, eds.  Current Diagnosis and Treatment- Infectious Diseases.  McGraw-Hill Medical 2016.

39. **Meyer JP**, Womack JA, Gibson B. Beyond the Pap Smear: Gender-responsive HIV Care for Women. The Yale Journal Of Biology And Medicine 2016, 89:193-203.

40. **Meyer JP**, Muthulingam D, El-Bassel N, Altice FL. Leveraging the U.S. Criminal Justice System to Access Women for HIV Interventions. AIDS And Behavior 2017, 21:3527-3548.

41. Shrestha R, McCoy-Redd B, **Meyer J**.  Pre-Exposure Prophylaxis (PrEP) for People Who Inject Drugs (PWID).  Brianna Norton, Ed.  The Opioid Epidemic and Infectious Diseases.  Elsevier 2019.

42. **Meyer JP**, Isaacs K, El-Shahawy O, Burlew AK, Wechsberg W. Research on women with substance use disorders: Reviewing progress and developing a research and implementation roadmap. Drug And Alcohol Dependence 2019, 197:158-163.


## Peer-Reviewed Educational Materials

43. The Fortune Society Reentry Education Project Detailing Kit.  New York City Department of Health and Mental Hygiene.  October 2014

44. United Nations Office on Drugs and Crime.  Vienna, Austria


## Invited Editorials and Commentaries

45. **Meyer JP**. Capsule Commentary on Pyra et al., sexual minority status and violence among HIV infected and at-risk women. Journal Of General Internal Medicine 2014, 29:1164.

46. Brinkley-Rubinstein L, Dauria E, Tolou-Shams M, Christopoulos K, Chan PA, Beckwith CG, Parker S, **Meyer J**. The Path to Implementation of HIV Pre-exposure Prophylaxis for People Involved in Criminal Justice Systems. Current HIV/AIDS Reports 2018, 15:93-95.

47. **Meyer JP**. The Sustained Harmful Health Effects of Incarceration for Women Living with HIV. Journal Of Women's Health (2002) 2019, 28:1017-1018.

Jaimie Meyer, MD, MS, FACP

**Case Reports, Technical Notes, Letters**

48. **Paul J**. Bullous pemphigoid in a patient with psoriasis and possible drug reaction: a case report. Connecticut Medicine 2004, 68:611-5.

49. How J, Azar MM, **Meyer JP**. Are Nectarines to Blame? A Case Report and Literature Review of Spontaneous Bacterial Peritonitis Due to Listeria monocytogenes. Connecticut Medicine 2015, 79:31-6.

50. Vazquez Guillamet LJ, Malinis MF, **Meyer JP**. Emerging role of Actinomyces meyeri in brain abscesses: A case report and literature review. IDCases 2017, 10:26-29.

51. Harada K, Heaton H, Chen J, Vazquez M, **Meyer J**. Zoster vaccine-associated primary varicella infection in an immunocompetent host. BMJ Case Reports 2017, 2017.

52. Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Answer to December 2017 Photo Quiz. Journal Of Clinical Microbiology 2017, 55:3568.

53. Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Photo Quiz: Peripheral Blood Smear in a Ugandan Refugee. Journal Of Clinical Microbiology 2017, 55:3313-3314.

**Scholarship In Press**

54. Hoff E, Adams Z, Dasgupta A, Goddard D, Sheth S, **Meyer J**.  Reproductive Health Justice and Autonomy: A systematic review of pregnancy planning intentions, needs, and interventions among women involved in US criminal justice systems.  J Women's Health